FILED

E-Filing

2008 FEB 26 PM 2: 07

1  Joseph M. Alioto (CA Bar #42680)
   ALIOTO LAW FIRM
2  555 California Street, Suite 3160
   San Francisco, CA 94104
3  Telephone: 415-434-8900
4  Facsimile: 415-434-9200
5  Email: jmalioto@aliotolaw.com

6  Daniel R. Shulman, *Pro Hac Vice* (MN Bar #100651)
   Jeremy L. Johnson, *Pro Hac Vice* (MN Bar #328558)
7  GRAY, PLANT, MOOTY, MOOTY & BENNETT, P.A.
   500 IDS Center, 80 South Eighth Street
8  Minneapolis, MN 55402
9  Telephone: (612) 632-3335
   Facsimile: 612-632-4335
10 Email: daniel.shulman@gpmlaw.com
         jeremy.johnson@gpmlaw.com
11
   Thomas P. Bleau (CA Bar #152945)
12 BLEAU, FOX & ASSOCIATES
   3575 Cahuenga Blvd., West, Suite 580
13 Los Angeles, CA 90068
   Telephone: (323) 874-8613
14 Facsimile: (323) 874-1234
15 Email: bleaushark@aol.com

16 Bradley K. Beasley, *Pro Hac Vice* (OK Bar #628)
   BOESCHE MCDERMOTT LLP
17 610 S. Main Street, Ste. 300
   Tulsa, OK 74119-1258
18 Telephone: (918) 583-1777
   Facsimile: (918) 592-5809
19 Email: bbeasley@bme-law.com

20
   Attorneys for Plaintiffs
21 [ADDITIONAL COUNSEL APPEAR ON LAST PAGE]

22           **UNITED STATES DISTRICT COURT**

23          **NORTHERN DISTRICT OF CALIFORNIA**

24 MIKE M. MADANI; RICK-MIK, INC.;        Case No.: C 07 4296 MEJ
25 OYSTER PETROLEUM, INC; M.R. OYSTER,    )
   INC.; HABIB ENTERPRISES, INC.; HABIB   )  **COMPLAINT FOR DAMAGES**
26 PETROLEUM, INC.; CALLOWAY OIL, INC.;   )  **FOR ANTITRUST VIOLATIONS**
27 STEVEN GROSSI; STEPHEN AND ANNIE       )
   SCHLABS; SOOY, INC.; GREGOIRE          )  **CLASS ACTION**
28 DUKMAJIAN; WILLIAM REED; SAMIR         )
   BAHOUTH; ARTHUR SALDANA; AMRITA        )  **JURY TRIAL DEMANDED**

CV08-01283 GAF (Ex)

DHILLON; AMOUNA, INC.; KEITH
FULLINGTON; ASHKAN
CORPORATION; GEORGE RABADI;
and PAUL ENSTAD,

           Plaintiffs, on behalf of
           themselves and those
           similarly situated

   v.

SHELL OIL COMPANY; CHEVRON
CORPORATION; and SAUDI REFINING, INC.,

           Defendants.

## I.

## INTRODUCTION

1.    Plaintiffs bring this action on behalf of themselves and the approximately 25,000 Shell and Texaco branded dealers nationwide who operate or have operated Shell or Texaco branded marketing premises and franchises throughout the United States and who purchased gasoline from MOTIVA ENTERPRISES LLC and/or EQUILON ENTERPRISES LLC, or both, from January, 1998, to October, 2001, except for those dealers who were plaintiffs in *Dagher v. Saudi Refining, Inc.*, Case No. CV-99-06114 GHK (JWJx) in the United States District Court for the Central District of California.

2.    Plaintiffs bring this action against defendants for damages caused by reason of defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and Section 7 of the Clayton Antitrust Act, 15 U.S.C. §18. Plaintiffs demand a trial by jury of all issues triable thereby, and for their complaint, allege as follows:

## II.

## JURISDICTION

3.    This Court has jurisdiction over plaintiffs' claims pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15, and 28 U.S.C. §1337.

### III.

### PLAINTIFFS

4.     The above-named plaintiffs, individually and on behalf of a class of persons similarly situated, are the following individuals and entities, who operate or have operated the following Shell or Texaco branded marketing premises and franchises at the following locations:

| Plaintiff | Station Brand | Leased Marketing Premises Yes/No | Station Location |
| --- | --- | --- | --- |
| Mike M. Madani | Texaco | No | 1700 Artesia<br>Redondo Beach, CA  90278 |
| Rick-Mik, Inc. | Shell | Yes | 25340 N. Chiquella<br>Newhall, CA  91321 |
| Oyster Petroleum, Inc. | Shell | Yes | 1051 Oliver Road<br>Fairfield, CA  94533 |
| M.R. Oyster, Inc. | Shell | Yes | 125 Sharon Park Drive<br>Menlo Park, CA  94025 |
| Habib Enterprises, Inc. | Shell | Yes | 6020 S. Congress Ave.<br>Lantana, FL  33463 |
| Habib Petroleum, Inc. | Shell | Yes | 2970 N. Military Trail<br>West Palm Beach, FL  33409 |
| Callaway Oil, Inc. | Shell | Yes | 12365 Poway Road<br>Poway, CA  92069 |
| Steven Grossi | Shell | Yes | 1129 Sepulveda<br>Manhattan Beach, CA  90266 |
| Stephen Schlabs<br>Annie Schlabs | Shell | Yes | 801 E. Washington<br>Petaluma, CA  94952 |
| Sooy, Inc. | Shell | Yes | 2000 Ralston Ave.<br>Belmont, CA  94002 |

| | | | |
|---|---|---|---|
| Gregoire Dukmajian | Texaco | No | 25001 S. Western Ave.<br>Lomita, CA 90717 |
| William Reed | Shell | Yes | 14717 Bear Valley Road<br>Hesperia, CA 92345 |
| Samir Bahouth | Shell | Yes | 859 N. Mountain Ave.<br>Ontario, CA 91711 |
| Arthur Saldana | Shell | Yes | 7825 Telegraph Road<br>Montebello, CA 90640 |
| Amrita Dhillon | Shell | Yes | 15710 Roscoe Blvd.<br>Van Nuys, CA 91406 |
| Amouna, Inc. | Shell | Yes | 24062 Lyons Ave.<br>Newhall, CA 91321 |
| Keith Fullington | Shell | Yes | 1709 Nogales<br>Rowland Heights, CA 91748 |
| Ashkan Corporation | Texaco | Yes | 23201 Ventura Blvd.<br>Woodland Hills, CA 91364 |
| George Rabadi | Shell | Yes | 11278 Laurel Canyon<br>San Fernando, CA 91340 |
| Paul Enstad | Shell | Yes | 1098 East Clark Street<br>Santa Maria, CA 93455 |

5.     Plaintiffs bring this action as a class action on behalf of the class alleged in paragraph 1 hereinabove. The class contains approximately 25,000 similarly situated individuals and/or entities within the United States, too numerous to list every name in the case caption, and, therefore, this action must be brought as a class action in order to protect the interests of class members, and these individuals and entities must be certified as a class in order adequately to litigate this action.

6.     The representative plaintiffs' claims are typical of the class generally. Plaintiffs, as named herein, share the exactly same interests as the other members of the class and are able fairly and adequately to represent the interests of all members of the class.

7.    The overall likelihood of individual class members' prosecuting separate claims is remote at best.  Individual members of the class may not or do not have a significant interest in individually controlling the prosecution of separate actions, and the impact of such a scenario upon the judicial system would be a tremendous waste of judicial resources and an undue burden on the federal court system.  Additionally, the prosecution of separate actions by individual class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards of conduct for defendants under the laws alleged herein.

8.    There is a well-defined commonality of interest in the questions of law and fact among the plaintiffs, as named herein, and the class members.  These common questions include whether the conduct of the defendants alleged hereafter constituted a violation of Section 1 of the Sherman Act or Section 7 of the Clayton Act, whether the defendants' conduct caused injury to the business and property of the class, and the amount of damage to the class.  Questions of law and fact common to the members of the class predominate over any questions which may affect only individual members, in that defendants have acted in a manner generally applicable to the entire Class.

9.    Each plaintiff who currently operates or has operated Shell branded marketing premises at all times relevant herein was in a franchise relationship with Shell Oil Co. or its assignee, Equilon Enterprises LLC or Motiva Enterprises LLC, and from approximately January, 1998, to October, 2001, purchased wholesale Shell branded gasoline from Equilon or Motiva for resale to the general public.

10.    Each plaintiff who currently operates or has operated Texaco branded marketing premises at all times relevant herein was in a franchise relationship with Texaco, Inc. or its assignee, Equilon Enterprises LLC or Motiva Enterprises LLC, and from approximately January, 1998, to October, 2001, purchased wholesale Texaco branded gasoline from Equilon for resale to the general public.

**IV.**

## DEFENDANTS

### Shell Oil Company

11.     Defendant SHELL OIL COMPANY ("Shell") is a corporation organized, existing, and doing business under the laws of the state of Delaware, with its headquarters and principal place of business at One Shell Plaza, Houston, Texas.  Shell is a subsidiary of the Royal Dutch/Shell Group which is composed of Royal Dutch Petroleum Company (domiciled in the Netherlands) and The "Shell" Transport and Trading Company (domiciled in the United Kingdom).

12.     Shell is, and at all times relevant herein, has been engaged in the business of exploring for and producing crude oil, transporting crude oil, and refining, transporting, storing, and marketing petroleum products, including gasoline, in the state of California and throughout the United States.

13.     Shell, as part of Royal Dutch/Shell Group, is one of the world's leading oil and natural gas producers, with substantial manufacturing, transportation and marketing functions.

14.     The Chairman of Shell met with the Chairmen of Saudi and Texaco for the purpose of forming and organizing a combination with Saudi and Texaco in the refining and marketing of gasoline.

15.     The Chairman of Shell knew and understood that the effect of the agreement with Saudi and Texaco would be the elimination of competition between and among Saudi, Texaco, and Shell in the refining and marketing of gasoline in the United States.

16.     The Chairman of Shell knew and understood that the agreement with Saudi and Texaco was an agreement among competitors to fix the price of gasoline sold to the independent Texaco and Shell retail dealers.

17.     Shell in fact combined with Saudi and Texaco to fix the price of gasoline sold to the independent Shell and Texaco retail dealers in the United States.

### Chevron Corporation

18.     Defendant, CHEVRON CORPORATION ("CHEVRON"), is a corporation organized, existing, and doing business under the laws of the state of Delaware, with its headquarters and principal place of business at San Ramon, California, and is the successor in interest of TEXACO, INC. ("Texaco"), a corporation formerly organized, existing, and doing business under the laws of the state of Delaware, with its headquarters and principal place of business at 2000 Westchester Avenue, White Plains, New York, which Chevron acquired on or about October 9, 2001.

19.     Texaco was at all times relevant herein engaged in the business of exploring for and producing crude oil, transporting crude oil, and refining, transporting, storing, and marketing petroleum products, including gasoline, in the State of California and throughout the United States.

20.     At the time of its acquisition by Chevron, Texaco was one of the world's leading oil and natural gas producers, with substantial manufacturing, transportation and marketing functions.

21.     The Chairman of Texaco met with the Chairmen of Shell and Saudi for the purpose of forming and organizing a combination with Shell and Saudi in the refining and marketing of gasoline.

22.     The Chairman of Texaco knew and understood that the effect of the agreement with Saudi and Shell would be the elimination of competition between and among Saudi, Texaco, and Shell in the refining and marketing of gasoline in the United States.

23.     The Chairman of Texaco knew and understood that the agreement with Saudi and Shell was an agreement among competitors to fix the price of gasoline sold to the independent Texaco and Shell retail dealers.

24.     Texaco in fact combined with Saudi and Shell to fix the price of gasoline sold to the independent Shell and Texaco retail dealers in the United States.

25.     When Chevron acquired Texaco in 2001, Chevron acquired any and all liabilities of Texaco with respect to the conduct alleged herein that is the subject of this action.

### Saudi Refining, Inc.

26.     Defendant SAUDI REFINING, INC. ("Saudi"), is a limited liability corporation with its headquarters and principal place of business in Houston, Texas.  It is a corporate affiliate of Saudi Aramco, the state-owned oil company of the Kingdom of Saudi Arabia, the principal member of OPEC, the international oil cartel.

27.     Saudi is, and at all times relevant herein, has been directly or indirectly engaged in the business of exploring for and producing crude oil, transporting crude oil, and refining, transporting, storing, and marketing petroleum products, including gasoline, in the United States.

28.     Saudi, as part of Saudi Aramco, is one of the world's leading oil and natural gas producers, with substantial manufacturing, transportation and marketing functions.

29.     The Chairman of Saudi met with the Chairmen of Shell and Texaco for the purpose of forming and organizing a combination with Shell and Texaco in the refining and marketing of gasoline.

30.     The Chairman of Saudi knew and understood that the effect of the agreement with Shell and Texaco would be the elimination of competition between and among Saudi, Texaco, and Shell in the refining and marketing of gasoline in the United States.

31.     The Chairman of Saudi knew and understood that the agreement with Shell and Texaco was an agreement among competitors to fix the price of gasoline sold to the independent Texaco and Shell retail dealers.

32.     Saudi in fact combined with Shell and Texaco to fix the price of gasoline sold to the independent Shell and Texaco retail dealers in the United States.

## Defendants' Formation of Equilon and Motiva

33.     On January 1, 1998, Shell and Texaco combined their marketing and refining assets in the Western United States in Equilon Enterprises LLC ("Equilon").  On July 1, 1998, they did the same in the Eastern United States through a second combination, Motiva Enterprises LLC ("Motiva"), in which Saudi also joined.

34.     Defendants regarded their combination as "almost breathtaking in its simplicity and audacity: the whole U.S. Downstream."

35.     Equilon was a limited liability corporation with its headquarters and principal place of business in Houston, Texas.

36.     Equilon was a combination between Texaco and Shell that combined their western and midwestern refining, transportation, terminal (storage), and marketing operations and assets.  Shell owned 56 percent of Equilon, and Texaco owned the other 44 percent.

37.     Equilon began operating during January, 1998, in the business of refining, transporting, storing, and marketing petroleum products, including gasoline, in the state of California and other western and mid-western states.

38.     Equilon refined and marketed gasoline and other petroleum products under both the Shell and Texaco brand names in all or parts of 32 states, selling products to 9,002 Shell and Texaco retail outlets.

39.     Equilon was the fourth largest retail gasoline marketer and the fourth largest refiner in the United States.

40.     Equilon's annual gross revenue was approximately $22 billion.

41.     Equilon was number one in market share in Oregon, Arizona, Nebraska, Oklahoma, Missouri, Arkansas and Kentucky.  Equilon was number two in market share in Alaska, Hawaii, California, Nevada, Idaho, Wyoming, Colorado, New Mexico, Indiana and Illinois.

42.     Equilon had seven refineries, refining approximately 846,000 barrels per day.  Equilon owned 76 terminals for crude oil and refined products in the United States.

43.   Equilon owned an interest, with its competitors, in 45,600 miles of pipeline throughout the United States.

44.   Equilon was a combination, in the form of a trust or otherwise, used by Shell and Texaco to fix the price of gasoline sold to the independent Shell and Texaco retail dealers in the western and midwestern states of the United States.

45.   Motiva was a limited liability corporation with its headquarters and principal place of business in Houston, Texas.

46.   Motiva was a combination among Texaco, Saudi, and Shell that combined their eastern United States and Gulf Coast refining, transportation, terminal (storage), and marketing operations and assets.  Shell owned 35 percent of Motiva, and Texaco and Saudi each owned 32.5 percent.

47.   Motiva began operations during July 1998, in the business of refining, transporting, storing, and marketing petroleum products, including gasoline, in the Gulf Coast and eastern United States.

48.   Motiva refined and marketed gasoline under the Shell and Texaco brand names in 27 states of the United States, selling products to 13,900 Shell and Texaco retail outlets.

49.   Motive was the second largest retail gasoline marketer and the eighth largest refiner in the United States.

50.   Motiva's annual gross revenue was approximately $11 billion.

51.   Motiva was number one in market share in Texas, Louisiana, Alabama, Mississippi, Tennessee, Florida, North Carolina, Rhode Island, New Jersey, Maryland, and Delaware.

52.   Motiva was number two in market share in Georgia, Virginia, Pennsylvania, New Hampshire, Vermont, Massachusetts and Connecticut.

53.   Motiva had four refineries, refining approximately 819,000 barrels per day. Motiva had 50 terminals for crude oil and refined products in the United States.

54.     Motiva was a combination, in the form of a trust or otherwise, used by Saudi, Texaco and Shell to fix the price of gasoline sold to the independent Shell and Texaco retail dealers in the eastern and Gulf coast states of the United States.

55.     Equilon and Motiva continued in operation in their original form until on or about October 9, 2001, when Chevron bought Texaco and sold Texaco's interest in Equilon to Shell and Texaco's interest in Motiva to Shell and Saudi.

### V.

### CO-CONSPIRATORS

56.     Plaintiffs are informed and believe that persons and entities whose identities are at this time unknown to plaintiffs have engaged with defendants in the violations alleged herein. Plaintiffs may at a later time amend this complaint to add said unknown co-conspirators as defendants when and if they become known.

### VI.

### TOLLING OF STATUTE OF LIMITATIONS

57.     On or about June 15, 1999, Fouad N. Dagher et al. filed suit against the defendants named herein and others in the United States District Court for the Central District of California in case no. CV-99-06114 GHK (JWJx) ("the Dagher action").

58.     On or about June 15, 1999, the plaintiffs in the Dagher action filed a first amended complaint "on behalf of themselves and the approximately 23,000 Shell and Texaco branded dealers nationwide who operate or have operated Shell or Texaco branded marketing premises and franchises throughout the United States and who have purchased gasoline from Defendants MOTIVA ENTERPRISES LLC and/or EQUILON ENTERPRISES LLC, or both, since January 1998 to the present time."

59.     The claims asserted in the first amended complaint in the Dagher action were that the conduct of the defendants in forming Equilon and Motiva and causing them to charge the same prices for the Shell and Texaco brands of gasoline constituted price fixing in violation of Section 1 of the Sherman Act under the per se rule or the quick look rule of reason.

60. The Dagher action terminated on or about November 15, 2006, when the District Court received the mandate of the United States Court of Appeals for the Ninth Circuit affirming the District Court's grant of summary judgment for the defendants pursuant to a decision of the United States Supreme Court on February 28, 2006.

61. During the pendency of the Dagher action, although the plaintiffs asked leave of Court to be permitted to file a motion for class certification, the Court declined to hear any class motion, and hence never entertained or ruled on a motion for class certification.

62. Accordingly, by reason of the class action allegations in the Dagher action, from June 15, 1998, until November 15, 2006, the applicable statute of limitations, 15 U.S.C. §15b, was tolled for all members of the alleged class, except for the named plaintiffs in the Dagher action, to assert claims for violation of the anitrust laws based on the conduct of the defendants in forming Equilon and Motiva and causing them to charge the same prices for the Shell and Texaco brands of gasoline.

63. Because plaintiffs have brought this action within four years of the conduct of defendants alleged herein, when the period of tolling occasioned by the Dagher action is taken into account, this action is timely and not barred by the applicable statute of limitations, 15 U.S.C. §15b.

## VII.

### TRADE AND COMMERCE VIII CONDUCT

### GIVING RISE TO VIOLATIONS OF LAW

64. The exploration, production, transportation, storage, refining, distribution, marketing, and selling of crude oil and gasoline are carried on in and substantially affect interstate and foreign commerce.

65. A combination and conspiracy among and between Shell, Texaco, and Saudi to combine their refining and marketing operations in the United States and to fix the price of gasoline sold to retail dealers substantially affects, impedes, and unreasonably restrains the free

flow of crude oil and gasoline between and among the various states of the United States, and foreign countries and the United States.

66.     Entry into the refining and marketing of gasoline is difficult and would not be timely, likely, or sufficient to prevent anticompetitive effects in those markets.

67.     By reason of the violations alleged herein, plaintiffs and the plaintiff class paid higher wholesale prices for branded gasoline than they would have paid in a free and competitive market.

68.     Following the launch of the Equilon combination, wholesale and retail prices of gasoline sold in the state of California and other states in which Equilon did business increased substantially.

69.     During that same period, total refinery production and inventories of gasoline rose compared to the same period in the previous year, refinery margins increased, and crude oil prices decreased.

70.     During 1998 and 1999, crude oil prices, when adjusted for inflation, dropped to their lowest levels since the Great Depression of the 1930's.

71.     During the time that crude oil prices were dropping to their lowest levels since the Great Depression, Shell, Texaco, and Saudi, by and through Equilon and Motiva, agreed to and did in fact fix and raise the price of gasoline sold to the independent Shell and Texaco branded retail dealers.

72.     Before Equilon and Motiva were formed, Shell, Texaco, and Saudi were actual competitors.

73.     Shell, Texaco, and Saudi combined and conspired to form Motiva and Equilon as the means to fix prices on gasoline sold to the independent Shell and Texaco retail dealers.

74.     Shell, Texaco, and Saudi did what they combined and conspired to do.

75.     Motiva and Equilon, as a combination of Shell, Texaco, and Saudi, did the following:

(a)     Marketed gasoline in all 50 states of the United States under both the Shell and Texaco brand names;

(b)     Ranked number one in national market share for branded gasoline, refining capacity and lubricant sales;

(c)     Had annual gross revenue of approximately $33 billion;

(d)     Provided product to 22,903 Texaco and Shell branded retail outlets;

(e)     Owned 11 refineries with a total refining capacity of 1,665,270 barrels per day;

(f)     Owned or had an interest in 126 crude oil and product terminals; and

(g)     Had ownership interests with their competitors in 45,600 miles of pipeline. By reason of the combination and conspiracy among Shell, Texaco, and Saudi to fix prices by and through their combinations, Equilon and Motiva, independent Shell and Texaco branded retailers paid more for their gasoline than they would have in a free and competitive market.

## VIII.

### CONDUCT GIVING RISE TO VIOLATIONS OF LAW

76.     On January 1, 1998, Shell and Texaco combined their marketing and refining assets in the Western United States in Equilon.  On July 1, 1998, they did the same in the Eastern United States through a second combination, Motiva, in which Saudi also joined.

77.     Both combinations were authorized to market the Shell and Texaco brands of gasoline under licenses and Brand Management Protocols, which reserved overall control of brand marketing to Shell for the Shell brand and Texaco for the Texaco brand, and prohibited Equilon and Motiva from favoring either brand over the other.

78.     Until September 1998, Equilon and Motiva set separate and distinct dealer tankwagon prices for the Shell and Texaco brands of gasoline through their own pricing departments, as Shell and Texaco had done before the ventures.

79.     At that time, Shell and Texaco agreed to require Equilon and Motiva to set the same price for the Shell and Texaco brands.

80.    Immediately after the implementation of the new pricing policy, dealer tankwagon prices rose precipitously, while the price of crude oil fell to its lowest level since the depression.

81.    The formation of the joint ventures resulted from negotiations that began in March 1996, when Shell and Texaco first conferred with each other about consolidating their "downstream" operations (*i.e.*, refining and marketing) in the United States. Saudi subsequently joined the discussions.

82.    The participants in the ventures referred to the overall combination of Equilon, Motiva, and related service companies as "The Alliance."

83.    Before The Alliance, the major players in the United States gasoline market included six major oil companies (Shell, Texaco, Exxon, Mobil, Chevron, and Amoco), each of which had a relatively stable market share of from 6% to 8%. Shell had a market share of 8%, and annual revenues of $18.3 billion; Texaco had a 7% share, with annual revenues of $18 billion.

84.    Prior to the formation of The Alliance, refining and marketing were profitable for both Shell and Texaco. Each planned cost reductions to improve downstream competitiveness and profits. Each believed, however, that in the absence of a combination like The Alliance, competition would force any cost savings each could independently achieve to be passed on to consumers. They envisioned solving this problem through The Alliance.

85.    The Alliance was not a merger. Shell and Texaco continued as before, except for the specific assets contributed to The Alliance. Just as they competed before The Alliance, they competed afterwards, unless specifically stated otherwise in written noncompete agreements.

86.    Excluded from The Alliance were all upstream business (*i.e.*, exploration and crude oil production), and all non-United States refining and marketing. Both Shell and Texaco were permitted to acquire and operate refineries in the United States if The Alliance declined the opportunity. They could continue importing foreign oil; marketing domestically produced unbranded fuel products that The Alliance did not wish to market; trading in financial

instruments; research and development; producing and selling aviation fuels, heavy oil fuels, coke, marine fuels, marine lubricants, sulfur, synthetic fuels, and natural gas; and soliciting sales to customers located in the United States for delivery of products outside the United States.

87.  Their written noncompete agreements prohibited Shell and Texaco from competing with The Alliance in the domestic sale of gasoline and related products.

88.  Shell and Texaco also retained ownership and control of their trademarks and brand names. License agreements allowed Equilon and Motiva to market the Shell and Texaco brands of gasoline. These license agreements were in turn subject to "Brand Management Protocol" agreements, which required that both the Shell and Texaco brands be preserved, that they be treated equally, and that neither received preferential treatment. A Brand Management Council of Shell and Texaco executives supervised use of the brands.

89.  Under these circumstances, Equilon and Motiva were not free to market the Texaco brand as a discount brand without the knowledge and consent of Texaco, or the Shell brand as a discount brand without the knowledge and consent of Shell. Likewise, Texaco could exert no influence or control of the ventures' marketing of the Shell brand without the knowledge and consent of Shell, and Shell could exert no influence or control over the ventures' marketing of the Texaco brand without the knowledge and consent of Texaco.

90.  At its formation, The Alliance had a market share of 15% of gasoline sales in the United States, double that of its next largest competitor. In 39 states, The Alliance's share exceeded 10%; in 15 of those states, its share exceeded 20%; in three states, it exceeded 30%. On the West Coast, The Alliance's share exceeded 25%.

91.  Shell and Texaco agreed that The Alliance could be dissolved at any time by mutual consent, and unilaterally by either party after five years.

92.  Members Committees consisting of Shell and Texaco executives, backed by support staffs of Shell and Texaco, governed The Alliance. The Alliance agreements provided, "The Company business shall be conducted by the CEO and other officers of the Company, subject to direction by, and in accordance with policies, business plans and budgets approved by"

Shell and Texaco "acting by and through the Members Committee." The agreements also required that "The Company business shall be conducted in accordance with the business plan and the annual budget then in effect and the policies, strategies and standards established by the Members Committee."

93.     At all times, the Shell and Texaco brands of gasoline have been and remain separate and distinct products, each with its own unique package of additives.

94.     The two brands also have always been marketed to different customer segments, with Texaco customers tending to be more blue collar and rural, and Shell customers tending to be more affluent and urban. Consequently, Texaco-branded gasoline was generally sold at two cents below the price of other major brands, including Shell, which was generally a price leader in the industry.

95.     Before the Alliance, Shell and Texaco pricing departments separately and independently set dealer tankwagon prices for their brands. With the Alliance's formation, the Shell and Texaco pricing departments moved into Equilon and Motiva, and continued to set prices separately for the two brands for the first eight months of the alliance, until at least September of 1998.

96.     At that point, Shell, Texaco, and Saudi agreed to change the pricing.

97.     Because they were required to conduct business "in accordance with policies, business plans and budgets approved by . . . the Members Committee," Equilon and Motiva in mid-1998 prepared business plans for review by Shell, Texaco, and Saudi. A key part of the business plans was a so-called "Strategic Marketing Initiative," which was ordered by defendants at August 1998 Members Committee meetings; and reviewed at September, November, and December meetings.

98.     The Strategic Marketing Initiative was "a look at how to move the . . . brands forward consistent with the Brand Protocol." One of its "priorities" was "price optimization" or "align brand pricing," which was reviewed at the September meetings. At those meetings, Shell,

Texaco, and Saudi directed Equilon and Motiva to charge the same dealer tankwagon price for the Shell and Texaco brands in each area in which the brands were priced.

99.    The decision to fix the same price for the two brands was not merely a decision by Equilon and Motiva management about pricing their products, but was a decision made by Shell, Texaco, and Saudi for the entire Alliance, including both Motiva and Equilon, and a restraint on pricing freedom imposed on the entire Alliance. It was also a direct outgrowth of the Brand Management Protocols, executed by Shell and Texaco before forming the Alliance, in which they agreed that their brands would be "treated equally" in the Alliance.

100.    During the pre-Alliance negotiations, Shell, Texaco, and Saudi knew that if antitrust regulators learned that they intended to fix prices, their proposed combination would face serious problems. Defendants ensured that the FTC had as little evidence as possible of their pre-Alliance discussions. Documents generated in the discussions were collected and destroyed at the end of meetings. Evidence of any price-fixing discussions that were part of the negotiations was thus destroyed and never submitted to the FTC for its review.

101.    After the Strategic Marketing Initiative was implemented, Equilon and Motiva set the same dealer tankwagon price for both the Shell and Texaco brands in each of thousands of distinct pricing areas throughout the United States.

102.    Once the brands were priced identically, the price differential of the Texaco brand disappeared, rising to the level of the Shell brand, and the Alliance sharply raised the price of both brands, even as crude oil prices were falling to historic lows.

103.    On September 1, 1989, the price of crude oil was stable at $12 per barrel and fell below $10 per barrel during January and February of 1999.

104.    During this same period, Equilon raised prices for Shell and Texaco gasoline from $.62 per gallon to $1.02 per gallon in Los Angeles, and from less that $.60 to more than $.90 per gallon in Portland and Seattle. In Chicago, Motiva raised brand prices from $.55 to $.75 per gallon. In San Francisco, from January to April, 1999, Equilon raised prices from $.72 to $1.12

per gallon.  Such increases generally occurred where Equilon and Motiva had larger market shares, particularly on the West Coast.

105.    These price increases by defendants affected not only the purchasers of defendants' gasoline, which amounted to a substantial share of the market in those areas where defendants raised prices, but also virtually the entire market as well, as defendants' major competitors availed themselves of the price umbrella created by defendants' price increases by raising their prices, so that all buyers ended up paying higher prices for gasoline in those markets where defendants raised prices, not just defendants' customers.

106.    Shell, Texaco, and Saudi justified forming the Alliance because of anticipated cost savings from their combination, estimated at $800 million per year.  These expected savings fell "into two buckets" – operating cost reductions from eliminating facilities and personnel that would become "redundant" because of the Alliance, and avoidance of capital expenditures defendants would have made absent the Alliance.

107.    Regardless of whether these savings materialized, none were passed on to consumers through lower prices, and none were intended to be.  Instead, the defendants anticipated that all costs savings would be retained and fall directly to the bottom line of the Alliance.

108.    The retention of cost savings as increased profits could result and did result only from the creation and exercise of market power, which the Alliance in fact possessed, both nationally and in those specific geographic markets where the Alliance raised gasoline prices, including, but not limited to, San Francisco, Los Angeles, Seattle, Portland, and Chicago.

109.    No efficiencies, cost savings, or competitive benefits resulted from charging the same price for the Shell and Texaco brands of gasoline, as executives of Shell, Texaco, and the Alliance all recognized and acknowledged in sworn testimony in the Dagher action.

110     The Alliance developed no new products or processes that Shell, Texaco, and Saudi did not have as independent competitors.

111.    In view of the facts peculiar to the business in which the defendants applied their restraint on prices, the condition of the business before and after the restraint was imposed, the nature of the restraint, and its actual and probable effects, which were to increase gasoline prices substantially in numerous markets throughout the United States, the defendants' actions in setting the same prices for the Shell and Texaco brands did not promote or regulate competition, but instead suppressed and destroyed it.

112.    The Alliance lasted only three years, ending in 2001 with Chevron's acquisition of Texaco.

## IX.

## INJURY TO COMPETITION AND PLAINTIFF CLASS

113.    As a direct and proximate result of the conduct of defendants described above in forming the Alliance and agreeing to cause Equilon and Motiva to charge the same prices for the Shell and Texaco brands, defendants have caused injury to competition, consumers, and the plaintiff class, in that (1) defendants created, in Equilon and Motiva, entities with market power in the refining and marketing of gasoline in the United States as a whole, and in numerous geographic submarkets thereof, including, but not limited to, Los Angeles, San Francisco, Seattle, Portland, and Chicago; (2) defendants caused Equilon and Motiva to exercise their market power by increasing dealer tankwagon prices for gasoline above the prices that would otherwise have been charged in a freely competitive market; (3) and the plaintiff class and consumers paid more for gasoline than they would otherwise have paid in a freely competitive market.

## X.

## SHERMAN ACT, SECTION 1

114.    Paragraphs 1 through 113 hereinabove are hereby incorporated herein by reference as if the same had been set forth in full.

115.    The conduct of Shell, Texaco, and Saudi in forming the Alliance and in agreeing to cause Equilon and Motiva to charge the same price for the Shell and Texaco brands of

gasoline constituted a contract, combination, or conspiracy that unreasonably restrained trade in the market for the sale of gasoline in the United States and in various geographic submarkets thereof, including, but not limited to, San Francisco, Los Angeles, Seattle, Portland, Seattle, and Chicago, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, under the Rule of Reason, which violation caused damage, injury, and loss to the business and property of the named plaintiffs and the plaintiff class, by reason of which the named plaintiffs and the plaintiff class are entitled to recover their actual damages sustained, trebled, together with their cost of suit, including a reasonable attorney's fee, as provided by Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

## XI.

## CLAYTON ACT, SECTION 7

116.    Paragraphs 1 through 113 hereinabove are hereby incorporated herein by reference as if the same had been set forth in full.

117.    The conduct of Shell, Texaco, and Saudi in forming the Alliance constituted an acquisition the effect of which was substantially to lessen competition in the sale of gasoline in the United States and in various geographic submarkets thereof, including, but not limited to, San Francisco, Los Angeles, Seattle, Portland, Seattle, and Chicago, in violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. §18, which violation caused damage, injury, and loss to the business and property of the named plaintiffs and the plaintiff class, by reason of which the named plaintiffs and the plaintiff class are entitled to recover their actual damages sustained, trebled, together with their cost of suit, including a reasonable attorney's fee, as provided by Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

## XII.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and all persons similarly situated pray for relief as follows:

(a)     that the court adjudge and decree the instant action as a Class Action on behalf of the plaintiff class alleged herein;

(b)     that the jury find and this Court adjudge and decree that defendants have violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and Section 7 of the Clayton Antitrust Act, 15 U.S.C. §18, as alleged herein;

(c)     that the named plaintiffs and the plaintiff class recover such actual damages as the jury shall find them to have sustained, and that the damages be trebled pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15;

(d)     that the defendants be ordered to provide to the plaintiffs a complete list of the names, addresses, and telephone numbers of the persons and entities who were  Shell or Texaco branded dealers nationwide operating Shell or Texaco branded marketing premises and franchises throughout the United States and who  purchased gasoline from Equilon or Motiva from January, 1998, through October, 2001;

(e)     that the Court award plaintiffs their cost of suit herein, including a reasonable attorney's fee, pursuant to Section 4 of the Clayton Act; and

(f)     that the Court award the named plaintiffs and the plaintiff class such other and further relief as it shall deem just and appropriate.

Dated: August 21, 2007

ALIOTO LAW FIRM
GRAY, PLANT, MOOTY, MOOTY & BENNETT, P.A.
BLEAU, FOX & ASSOCIATES, A.P.C.
BOESCHE MCDERMOTT LLP
SAVERI & SAVERI, INC.
LAW OFFICES OF JEFFERY K. PERKINS
LAW OFFICES OF JAMES M. DOMBROSKI
LAW OFFICES OF JOHN H. BOONE

By : _____
Joseph M. Alioto, Esq.

# DEMAND FOR JURY

NOTICE IS HEREBY GIVEN that the plaintiffs in the above-entitled action demand a trial by jury of all issues properly triable thereby.

Dated:   August 21, 2007                    ALIOTO LAW FIRM

By: _____
                    Joseph M. Alioto, Esq.

GP:2229051 v1

1

**PLAINTIFFS' COUNSEL**

2

ALIOTO LAW FIRM
Joseph M. Alioto, SBN 42680
Theresa D. Moore, SBN 99978
Angelina Alioto-Grace, SBN 206899
Joseph M. Alioto, Jr., SBN 215544
Thomas P. Pier, SBN 235740
555 California Street, Suite 3160
San Francisco, CA  94104
Telephone: (415)  434-8900
Facsimile: (415) 434-9200
Email: esexton@aliotolaw.com
Email: tmoore@aliotolaw.com

GRAY, PLANT, MOOTY, MOOTY &
BENNETT, P.A.
Daniel R. Shulman, *Pro Hac Vice* MN Bar
#100651
Jeremy L. Johnson, *Pro Hac Vice* MN Bar
#328558
500 IDS Center, 80 South Eighth Street
Minneapolis, MN  55402
Telephone:  (612) 632-3335
Facsimile:  (612) 632-4335
Email:  Daniel.shulman@gpmlaw.com
Jeremy.johnson@gpmlaw.com

BLEAU, FOX & ASSOCIATES
Thomas P. Bleau (CA Bar #152945)
3575 Cahuenga Blvd., West, Suite 580
Los Angeles, CA  90068
Telephone:  (323) 874-8613
Facsimile:  (323) 874-1234
Email:  bleaushark@aol.com

LAW OFFICES OF JEFFERY K. PERKINS
Jeffery K. Perkins, SBN 57996
1275 Columbus Avenue
San Francisco, CA 94133
Telephone: (415) 474-3833
Facsimile: (415) 474-2890
Email: jefferykperkins@aol.com

BOESCHE McDERMOTT LLP
Bradley K. Beasley, *Pro Hac Vice* (OK
Bar #628)
610 S. Main Street, Suite 300
Tulsa, OK  74119-1258
Telephone:  (918) 583-1777
Facsimile:  (918) 592-5809
Email:  bbeasley@bme-law.com

LAW OFFICE OF JAMES M. DOMBROSKI
James M. Dombroski, SBN 56898
P.O. Box 751027
Petaluma, CA 94975
Telephone: (707) 762-7807
Facsimile: (707) 769-0419
Email: jdomski@aol.com

SAVERI & SAVERI, INC.
R. Alexander Saveri (SBN 173102)
111 Pine Street, Suite 1700
San Francisco, CA  94111-5619
Telephone:  (415) 217-6810
Facsimile:  (415) 217-6813
Email:  rick@saveri.com

LAW OFFICES OF JOHN H. BOONE
John H. Boone (SBN 44876)
555 California Street, Suite 3160
San Francisco, CA  94104-1534
Telephone:  (415) 434-8900
Facsimile:  (415) 434-9200
Email:  jboone@dc.rr.com